UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>           Plaintiff,<br><br>      v.<br><br>Curtis Dale Sanders,<br><br>           Defendant. | No. 2:13-CR-00312-KJM<br><br>AMENDED ORDER |

Defendant Curtis Dale Sanders moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A), citing his vulnerability to COVID-19 because of his body mass index (BMI) and high blood pressure. *See* Pro Se Mot., ECF No. 133; Suppl. Mot., ECF No. 142.[1] The government opposes Sanders' motion arguing he has not exhausted his administrative remedies and poses a danger to the community. *See generally* ECF Nos. 134 & 146. The government does not contest Mr. Sanders' increased risk of developing severe COVID-19 complications or that inmates and staff at the Federal Correctional Institution in Florence, Colorado (FCI Florence) where defendant resides have contracted COVID-19. *See* Opp'n, ECF No. 146. As explained in more detail below, the motion is **granted.**

---

[1] The court notes counsel was appointed on June 24, 2020 after defendant's initial pro se filing. *See* Sanders Decl., ECF No. 148; Suppl. Br., ECF No. 149. The government opposes his motion. *See generally* ECF Nos. 134 & 146.

1

# I.   BACKGROUND

Mr. Sanders was convicted of conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846 (count one), and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (count two).  *See* Plea Agreement, ECF No. 71.  On August 20, 2014, this court sentenced Mr. Sanders to 196 months on each count, to be served concurrently for a total term of 196 months in prison, 36 months of supervised release; and a $200 special assessment.  *See* Judgment, ECF No. 107; *see also* Sentencing Hr'g Mins., ECF No. 90.  As of September 23, 2020, Mr. Sanders had served 94 months, or 47.9 percent of his full term sentence.  Opp'n Ex. 1 (Public Inmate Data) at 19, ECF No. 146-1.  As of this writing he has completed 97 months of his 196-month sentence, or approximately 49 percent of his full term.

Mr. Sanders has provided copies of his medical records, which reflect he has a body mass index (BMI) of 33.5 and high blood pressure.  Suppl. Mot. Ex A (Medical Records) at 3, 6.[2]  While his high blood pressure is regularly monitored by BOP Health Services, he has not been formally diagnosed with hypertension.  Suppl. Mot. at 7.

As noted, Mr. Sanders is currently incarcerated at FCI Florence in Colorado.  *See* Opp'n at 4.  His projected release date is March 10, 2027.  Public Inmate Data at 19.  The government does not dispute that, at the time the government filed its opposition, there were 8 inmates and 5 staff members who tested positive for COVID-19.  Opp'n at 6 (citing BOP, *COVID-19 Cases* (updated daily) accessed Sept. 22, 2020).[3]  A month later, BOP showed the numbers of inmates who tested positive for COVID was seven times higher than in September; 58 inmates showed positive for COVID-19.  BOP, *COVID-19 Cases* (updated daily) (accessed Nov. 19, 2020).  At the time this order is being issued, 22 inmates and 41 staff have current positive tests for COVID-

---

[2] The court grants Sanders' request to file this exhibit under seal to protect his private medical information.  *See Chester v. King*, No. 1:16-cv-01257, 2019 U.S. Dist. LEXIS 154413, at *5 (E.D. Cal. Sep. 10, 2019) ("This court, and others within the Ninth Circuit, have recognized that the need to protect medical privacy qualifies as a 'compelling reason' for sealing records.").

[3] https://www.bop.gov/coronavirus/

19. *Id*. (accessed January 4, 2021).  Five hundred sixty-five inmates and five staff are listed as recovered at FCI Florence.  *Id.*

Mr. Sanders claims that on July 1, 2020, he filed a compassionate release request with the warden of FCI Florence.  Suppl. Mot., Ex. B (Request to Warden), ECF No. 142-2.[4]  According to the U.S. Attorney, the BOP claims it has no record of Mr. Sanders' request.  Opp'n at 4.  On September 24, 2020, defense counsel provided the warden at FCI Florence with another copy of Mr. Sanders' original request via e-mail.  *See* Suppl. Mot., Ex. D, ECF No. 147-1.  Mr. Sanders has also submitted a declaration under penalty of perjury stating: "On July 1, 2020, [he] provided [his] correctional counselor, Mr. Quintana, with the original BOP request for Compassionate Release."  *See* Sanders Decl. ¶ 1, ECF No. 148.

## II. LEGAL STANDARD

The district court that imposed sentence on a criminal defendant has authority to modify the term of imprisonment under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018.[5]  Under the statute, a court may grant a defendant's motion to reduce her prison term, provided the defendant first satisfies an exhaustion requirement. 18 U.S.C. §§ 3582(c)(1)(A), 3582(c)(1)(A)(i).  Generally, exhaustion requires defendants to seek compassionate release with the BOP and exhaust all appeals or show that at least 30 days have elapsed without a response from the BOP, whichever is earlier.  *United States v. Bradley*, No. 14-00293, 2020 WL 3802794, at *3 (E.D. Cal. July 7, 2020).  Once the defendant has exhausted administrative remedies, the analysis is twofold.  First, the court must find "extraordinary and compelling reasons" to release a defendant from BOP custody.  18 U.S.C. § 3582(c)(1)(A). Second, the court must consider the same factors applicable at the original sentencing, enumerated in 18 U.S.C. § 3553(a), to the extent they remain applicable at the time the motion is brought.  *Id.*

---

[4] The court notes Mr. Sanders pro se motion documents his attempts to request compassionate release from the BOP while in transit through the Oklahoma City Federal Transfer Center.  *See* Pro Se Mot. at 4 (describing he was "denied administrative remedies forms"). Shortly thereafter, Mr. Sanders was transferred to FCI Florence.

[5] Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018).

3

The statute further requires "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id*. § 3582(c)(1)(A). In 2006, the Sentencing Commission issued a policy statement addressing what qualifies as "extraordinary and compelling reasons" to release a defendant from BOP custody, which was last amended November 1, 2018. *See* U.S.S.G. § 1B1.13. Since the passage of the First Step Act, district courts have disagreed whether U.S.S.G. § 1B1.13 remains binding. This court, as it has in previous cases, considers the Sentencing Commission's policy statement as guidance, without determining whether it is binding in this context. The court notes as relevant here that, in addition to listing possible "extraordinary and compelling reasons," section 1B1.13 "imposes an additional consideration of whether the defendant is a danger to the safety of any other person or to the community." *United States v. Numann*, No. 16-00025, 2020 WL 1977117, at *2 (D. Alaska Apr. 24, 2020) (citing U.S.S.G. § 1B1.13(2)).

## III.  ANALYSIS

### A.  Exhaustion

The government disputes defendant has satisfied the exhaustion requirement and argues "BOP has no record" defendant submitted his request for compassionate release to the "Warden at Oklahoma FTC" while he was at Oklahoma, before he was transferred from Oklahoma City FTC to FCI Florence on June 17, 2020. Opp'n at 4. Mr. Sanders asserts he exhausted his administrative remedies because well more than thirty days have passed since July 1, 2020 when he filed an additional request for compassionate release while at FCI Florence. *See* Suppl. Mot. at 2. Mr. Sanders used a form evidently available to him once he was transferred. *See generally* Request to Warden; Sanders Decl. ¶ 1 (declaring under oath "On July 1, 2020, I provided my correctional counselor, Mr. Quintana, [at FCI Florence] with the original of my BOP Request for Compassionate Release."). Generally, exhaustion requires a defendant seek compassionate release with the BOP warden and exhaust all appeals or show that at least 30 days have lapsed since the warden's receipt and the warden has failed to respond to defendant's request, whichever is earlier. *See United States v. Miller*, No. 2:16-CR-00269-BLW, 2020 WL 113349, at *2 (D. Idaho Jan. 8, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)). The court "may credit a defendant's

4

sworn declaration that he filed such requests with the Warden, especially where the Government does not bring forth any evidence to dispute or contradict [the defendant]'s sworn Declaration." *United States v. McKeel*, No. 1:16-CR-88-LG-JCG-1, 2020 WL 3980032, at *2 (S.D. Miss. July 14, 2020), *reconsideration denied*, No. 1:16-CR-88-LG-JCG-1, 2020 WL 5083863 (S.D. Miss. Aug. 26, 2020) (citation, internal quotations omitted). Accordingly, on this record, the court considers the operative date for measuring satisfaction of the 30-day requirement to be that on which Mr. Sanders avers he submitted his request to the warden. *See, e.g.*, *United States v. Feucht*, No. 11-cr-60025, 2020 WL 2781600, at *2 (S.D. Fla. May 28, 2020) ("[T]he 30-day period should be measured from the date on which a prisoner submits his or her request to the BOP, not the date the request is received by the Warden."). In any event, while Mr. Sanders still has not received a response from the BOP warden, Suppl. Mot. at 2, more than thirty days have elapsed since Mr. Sanders requested relief on July 1. Mr. Sanders exhausted his administrative remedies and the court has jurisdiction to consider the merits of his motion.

Because the court finds defendant's motion is properly before the court, it considers (A) whether Sanders has demonstrated that his motion is supported by extraordinary and compelling reasons and (B) whether applicable sentencing factors of § 3553(a) support his motion.

### B.     Extraordinary and Compelling Reasons

On September 22, 2020 the Bureau of Prisons, "COVID-19 Cases," reported 8 confirmed cases among inmates. *See* Opp'n at 6. On December 2, 2020, the inmate numbers appear to have spiked, to 80 COVID-positive inmates and 19 COVID-positive staff. *See generally* Suppl. Br. As of the date of this order in the Florence facility where Sanders is housed, 22 inmates and a higher number of 41 staff have current positive tests for COVID-19.[6] Additionally, 565 inmates and 5 staff are listed as recovered with one inmate death reported. *Id.*[7] The persistent high rates of those infected by COVID and the congregate environment in the prison make for a heightened risk of infection for Mr. Sanders.

/////

---

[6] https://www.bop.gov/coronavirus/ (accessed Jan. 4, 2021).
[7] *Id.*

      Moreover, Mr. Sanders' BMI increases the risk he would suffer severe complications from a COVID-19 infection. According to the CDC, obesity is a risk factor for severe illness from COVID-19. *See* CDC, *People Who are at Increased Risk for Severe Illness* [8]; *see also* CDC, *Body Mass Index* [9] (explaining BMI of 30 or above puts one at increased risk of severe illness from COVID-19). While the government challenges Mr. Sanders' health condition on grounds he is only "slightly obese," *see* Opp'n at 5 (citing Medical Records at 6), this court previously has considered whether obesity is a condition that increases the risk for a severe case of COVID-19 if defendant contracts the virus and found no such distinction warranted. Specifically, in *United States v. Terraciano*, No. 2:17-CR-00187-KJM-2, 2020 WL 5878284, at *4 (E.D. Cal. Oct. 2, 2020), the court found a BMI at the borderline between values that doctors consider "overweight" and "obese" may still show "extraordinary and compelling reasons to grant [defendant's] request under § 3582(c)." *See also, e.g.*, *United States v. Richardson*, No. 2:17-CR-00048-JAM, 2020 WL 3402410, at *3 (E.D. Cal. June 19, 2020) ("obesity alone" places defendant "at higher risk of COVID-19 complications). The court sees no reason to revisit this conclusion on this record.

      The government also argues because Mr. Sanders is not formally diagnosed with "hypertension," his condition supporting regular blood pressure monitoring is not recognized by the CDC as a serious chronic health condition that would increase his risk of severe illness from COVID-19. *See* Opp'n at 5, 13. Mr. Sanders concedes he has not been formally diagnosed with hypertension but contends his high blood pressure levels place him at "stage 2 or 3 hypertension," *see* Medical Records at 1–5, 7, 8, 10 (noting blood pressure readings of 180/90, 169/80, 140/70 as "elevated" with instructions for "rechecking" on a "weekly" basis); *see also* Suppl. Mot. at 7. The American Heart Association guidelines for blood pressure categories indicate "high blood pressure (hypertension) stage 2" as blood pressure readings of either "140 or higher systolic or 90 or higher diastolic." Suppl. Mot. at 7.[10] Based on this record, Mr. Sanders'

---

[8] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (accessed Nov. 20, 2020).

[9] https://www.cdc.gov/healthyweight/assessing/bmi/index.html (accessed Nov. 20, 2020).

[10] https://www.health.harvard.edu/heart-health/reading-the-new-blood-pressure-guidelines

blood pressure readings show elevated systolic readings of 180, 169 and 140, and it appears these readings are consistent with hypertension stage 2. *See United States v. Salvagno*, 456 F. Supp. 3d 420, 437 (N.D.N.Y. 2020), *reconsideration denied* (June 22, 2020) (finding availability of defendant's specific blood pressure readings was a proper basis for reconsideration).[11] And hypertension alone, like an elevated BMI, places a person at risk in the face of COVID-19. *United States v. Richardson*, No. 17-00048, 2020 WL 3402410, at *3 (E.D. Cal. June 19, 2020) ("Defendant's hypertension alone places him at significant risk of complications.").

Most concerning, it appears FCI Florence has shown itself incapable or unwilling to treat Mr. Sanders' medical condition by not providing him with further evaluation or treatment despite the repeated high blood pressure readings in the span of four months. *See generally* Medical Records (documenting elevated blood pressure on 4/5/2020, 5/9/2020 and 8/12/2020); *see also* Suppl. Mot. 7–8 (relying on BOP, 2015 Clinical Practice Guidelines for Management of Hypertension indicating same criteria for diagnosis of high blood pressure as American Heart Association).[12] The government's failure to provide treatment for Mr. Sanders' elevated blood pressure demonstrates he is not adequately cared for at FCI Florence and cannot properly care for himself. *See* U.S.S.G. § 1B1.13 (ability to care for oneself is a significant consideration when determining appropriateness of sentence modification); *see also United States v. Fernandez*, No. 2:16-00115, 2020 WL 5909490, at *3, 5 (E.D. Cal. Oct. 6, 2020). This failure to provide self-care taken together with the high risk of infection at FCI Florence and Mr. Sanders' health conditions provide extraordinary and compelling reasons to grant his request under § 3582(c).

/////

---

[11] Relying on *Blood Pressure Chart: What Your Reading Means*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/blood-pressure/art-20050982 (indicating that a top number (systolic) between 130 and 139 or a bottom number (diastolic) between 80 and 89 indicates stage 1 hypertension, while a systolic reading of at least 140 or a diastolic reading of at least 90 indicates stage 2 hypertension).

[12] https://www.bop.gov/resources/pdfs/hypertension_2015.pdf ("Hypertension is diagnosed with an accurately measured systolic blood pressure (SBP) of 140 mm Hg or greater *or* a diastolic blood pressure (DBP) of 90 mm Hg or greater") (accessed Nov. 21, 2020).

7

1       **C.      Section 3553(a) Sentencing Factors**

2       The court also considers whether Mr. Sanders is "a danger to the safety of any other

3  person or to the community, as provided in 18 U.S.C. § 3142(g)," accepting this Guidelines

4  statement as guidance.  U.S.S.G. § 1B1.13.

5       Mr. Sanders was convicted of a serious offense, which warrants careful consideration in

6  the dangerousness analysis.  *See, e.g.*, 18 U.S.C. § 3553(a) (requiring sentencing court to

7  consider, among other factors, "the nature and circumstances of the offense"; "the need for the

8  sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and

9  to provide just punishment for the offense"; and for sentence "to afford adequate deterrence to

10 criminal conduct").  In addition to the conviction itself, the factual basis for Mr. Sanders' plea

11 agreement reflects that Mr. Sanders led officers on an extended high-speed chase on Interstate 80,

12 then eastbound onto Interstate 780, across the Benicia Bridge, and onto I-680 shortly after buying

13 the methamphetamine underlying his conviction offenses.  *See* Plea Agreement at 11.  As police

14 officers continued to chase Mr. Sanders through the City of Concord and Pleasant Hill, his pickup

15 truck reached an erratic eighty miles per hour on city streets.  *Id*.  Mr. Sanders finally crashed into

16 some pylons in front of an elementary school.  *Id*.  After the crash, officers recovered 105.3 grams

17 of methamphetamine from his vehicle.  *Id*.  Since his incarceration with BOP, from 2015 to

18 2017, Mr. Sanders has incurred disciplinary incidents involving the use of narcotics, with the last

19 violation conduct occurring in July 2017.  *See* Opp'n Ex. 3 (Inmate Discipline Data) 8–10, ECF

20 No. 134-1 ("inmate found guilty of use of narcotic; positive UA for buprenorphine").  These

21 factors, the nature of the conviction offense and the prison disciplinaries, weigh against Mr.

22 Sanders' request.  At the same time, the length of time Mr. Sanders has spent incarcerated is

23 significant.  Additionally, the BOP recognizes his need for substance abuse treatment as reflected

24 in defense counsel's unrebutted representation that his transfer to FCI Florence would have

25 allowed his participation in the Residential Drug Abuse Program if that program were not

26 suspended due to COVID-19.

27      If he is released as requested Mr. Sanders has proposed a release plan prepared with the

28 assistance of the Federal Defender's Office, that addresses his substance abuse issues and that the

Probation Office has indicated will allow it to supervise and monitor him. *See* Release Plan, ECF No. 142-3. Mr. Sanders proposes to live with his close friend Sherman Tamplen, who has agreed to maintain a substance-free and firearm-free home environment. *Id*. at 1. Defendant would have his own bedroom and share a bathroom with Mr. Tamplen. *Id*. This would allow Mr. Sanders to follow self-quarantine and shelter in place directives. *Id*. Mr. Sanders would have access to online and in-person twelve-step recovery programs during his stay with Mr. Tamplen. *Id*. at 2. As noted, the court's Probation Office has reviewed defendant's release plan and indicated his residential plans are acceptable and does not recommend a period of home detention. All previously ordered conditions of release will remain in effect, as will defendant's obligation to pay off his monetary penalty. *See generally* Judgment. Mr. Sanders will be subject to supervision and closely monitored, with the risk that his release will be revoked if he does not comply strictly with each and every condition.

Upon evaluation of all the factors to be considered in imposing a sentence, 18 U.S.C. § 3553(a), this court finds its concerns regarding dangerousness are addressed by Mr. Sanders' release plan.

**D.    Sealing**

The Government and Mr. Sanders request medical records be sealed. The court has considered the factors set forth in *Oregonian Publishing Co. v. U.S. District Court for the District of Oregon*, 920 F.2d 1462 (9th Cir. 1990) ("(1) closure serves a compelling interest; (2) there is a substantial possibility that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives that would adequately protect the compelling interest.") (citing *Press-Enterprise Co. v. Superior Court of California for Riverside Cnty.*, 478 U.S. 1, at 13–14 (1986)). The subjects of medical records have a strong interest in confidentiality, which, in this case, outweighs the public's interest in access. *See Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1180 (9th Cir. 2006); *see also United States v. Maddawalaabuu Dadi*, No. CR18-0283, 2020 WL 5982007, at *1 (W.D. Wash. Oct. 8, 2020).

/////

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for compassionate release is **granted.**

The court modifies defendant's previously imposed sentence of incarceration of 196 months to time served.

The court ORDERS Mr. Sanders to self-isolate for fourteen days in the residence of Mr. Tamplen once he arrives there, as a means of protecting his health and that of the others residing in the home while also complying with all applicable public health orders.  There being a verified residence and an appropriate release plan in place, this order is stayed for up to seven days to make appropriate travel arrangements and to ensure the defendant's safe release. The defendant shall be released as soon as appropriate travel arrangements are made and it is safe for the defendant to travel. There shall be no delay in ensuring travel arrangements are made. If more than seven days are needed to make appropriate travel arrangements and ensure the defendant's safe release, then the parties shall immediately notify the court and show cause why the stay should be extended.

Defendant's request to seal his medical records, Exhibit A, is **granted**.

This order resolves ECF Nos. 133, 143, 147.

IT IS SO ORDERED.

DATED: January 6, 2021
 *nunc pro tunc* to 1/5/21

CHIEF UNITED STATES DISTRICT JUDGE